OPINION
{¶ 1} Defendant-appellant, Branden L. Smith, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdicts, of one count of aggravated robbery in violation of R.C. 2911.01, a felony of the first degree, one count of robbery in violation of R.C. 2911.02, a second-degree felony, and one count of robbery in violation of R.C. 2911.02, a third-degree felony, all with specifications pursuant to R.C. 2941.145 and 2941.141, as well as one count of carrying a concealed *Page 2 
weapon in violation of R.C. 2923.12, a fourth-degree felony. Defendant assigns a single error:
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE APPELLANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
Because sufficient evidence and the manifest weight of the evidence both support the trial court's judgment, we affirm.
 {¶ 2} By indictment filed on February 25, 2005, defendant was charged with one count of aggravated robbery and two counts of robbery, each with two gun specifications, as well as one count of carrying a concealed weapon. The matter was tried to a jury beginning March 21, 2006.
 {¶ 3} According to the state's evidence, on February 12, 2005, Chavis Tillman was the manager of the McDonald's restaurant at 2245 Morse Road in Columbus, Ohio. Tillman was at the store's front cash register between 2:30 p.m. and 3:00 p.m. when he noticed a man with a gun outside the restaurant getting ready to pull down a mask and come into the store; another man accompanied the man with the gun. Tillman advised all of the employees and patrons not to panic; he told them they were going to be robbed, but they should stay calm. Of the two men, Tillman recognized the one carrying the shotgun as a regular customer; he did not see the other man's face because of his mask.
 {¶ 4} Both men entered the store, their masks leaving open the areas around their nose, eyes, and forehead. The man with the shotgun fired it into the ceiling and hit one of the light fixtures. At the gunman's demand, Tillman opened the register. Tillman was then called to the back of the store, where the man with the shotgun and an *Page 3 
employee asked him to open another cash register. When the robbers asked him to open the safe, he did so, and one of them took the money from it. Tillman estimated that the robbers collected a total of $500 to $800 from both registers and the safe. The robbers then returned to the front of the store and left. Before they left, Roy Lee Cain, Jr., a 17-year employee of McDonald's, heard the gunman say, "Come on Branden, let's go." (Tr. 106.) After their departure, Tillman called the police.
 {¶ 5} Although Tillman recognized the man with the shotgun as a regular, he did not know the man's name. Four days after the robbery he was presented photo arrays but was unable to identify anyone from the array. At trial, however, he was able to identify Exhibit L-4 as the shotgun used in the robbery. As Tillman explained, the shotgun presented at trial was taped similarly to the one used in the robbery. Tillman, at trial, also identified a mask, Exhibit P-2, as similar, if not identical, to the masks the robbers wore. As Tillman clarified, he could see no difference between the exhibit and the mask he saw on the robbers.
 {¶ 6} On February 18, 2005, Officer Christopher Burich and his partner, Aisha Dilelo, were dispatched on a "gun run" to an area on Shanley Drive not far from the McDonald's subject of the February 12, 2005 robbery. Two officers, the "walkie crew," were already at the location and said they saw a car matching the description given to Burich. (Tr. 121.) At that point, a car drove past them, and Burich recognized the driver as Santell Hughes. Burich and his partner turned their paddy wagon around and followed the other police officers as they pursued the car Hughes was driving.
 {¶ 7} Before Burich and Dilelo reached Hughes' car, Hughes exited it from the driver's side door while the car was still in motion. Because the officers in the other car *Page 4 
were ahead of Burich and Dilelo, the other officers pursued Hughes. When defendant also exited through the driver's door, Burich chased him on foot through an apartment complex and caught him. Burich found a rag hanging out of defendant's back pocket. According to Burich, it appeared to be the arm from a long-sleeved shirt and had two little slits that looked like holes for eyes.
 {¶ 8} As Burich was walking defendant back to the paddy wagon, he heard over the radio an alert for a gun in the vehicle. Burich looked into the back seat of the car Hughes had been driving and saw a gun lying on the back seat. The barrel and stock were covered with plastic bags, but Burich could see the chamber. Burich identified state's Exhibit L-4 as the shotgun taken out of the car; Cheryl Varney, an employee of McDonald's at the time of the robbery, recognized Exhibit L-4 from the day of the robbery.
 {¶ 9} After the February 18 arrest involving Hughes and defendant, Detective Michael Longworth compiled several photo arrays and showed them to Tillman on February 19, 2005. Tillman recognized the gunman, later known by name as Santell Hughes, in one of the arrays.
 {¶ 10} Dr. Raman Tejwani, Ph.D., with the Columbus Police Department Crime Lab, performed a DNA analysis regarding the mask marked as Exhibit P-2, oral swab standards from defendant and Hughes, and the shotgun. On the mask, Tejwani found DNA on the mouth area and cuff. The DNA types from the mask mouth area matched defendant's DNA; the cuff area matched Hughes' DNA. Because the shotgun had mixed samples, Tejwani was unable to perform a comparison.
 {¶ 11} Defendant's witnesses, by contrast, testified that on February 12, 2005, defendant was released from jail, having been incarcerated for about one month for *Page 5 
violating probation imposed under a domestic violation conviction. According to defendant, he was released at approximately 9:45 a.m. that day, and his grandmother picked him up, along with a friend whom they dropped off in downtown Columbus with money for bus fare.
 {¶ 12} The testimony of both of defendant's grandparents noted defendant's strong need to dress neatly and cleanly. Indeed, defendant and his grandmother, after dropping off defendant's friend, stopped at a store to buy personal hygiene items before returning to the home of defendant's grandparents. About 2:30 p.m., his grandparents took him to the home where his sister Shanda was living, as defendant was to have his hair braided there; they arrived at approximately 2:50 p.m. Defendant's grandparents did not enter the home, but left defendant there. Two days later they saw defendant on Valentine's Day, when they also celebrated Christmas due to defendant's incarceration on Christmas Day. Defendant received money, approximately $100. Defendant never left his grandparents' house at any time between arriving there after the stop for personal hygiene items and the trip to his sister's home.
 {¶ 13} According to defendant, on February 18, 2005, he wanted to have his hair braided, as his sister had not braided it. He caught a bus and then walked to an apartment complex where he understood a Mexican woman would braid his hair. When she refused, he left the house and saw Santell Hughes pull up in his car. While defendant did not really know Hughes and had never exchanged words with him until that day, he told Hughes he was going to get his hair done. Hughes offered him a ride, and defendant took it. As they headed to a beauty academy, they smoked marijuana. Noticing a smudge on his shoes, defendant asked Hughes for a rag so that he could "spit-shine" his shoes. *Page 6 
(Tr. 318.) The police found the rag, Exhibit P-2, in defendant's back pocket. When defendant arrived at the beauty academy, he found no chairs were available, so he scheduled an appointment for the next day. He returned to the car, and Hughes drove back toward the apartment complex. When they saw the paddy wagon and cruiser behind them, Hughes became scared and jumped out of the car. Defendant also jumped because he had been smoking marijuana and was just out of jail. At police headquarters, he learned the rag was a mask used in a robbery.
 {¶ 14} Defendant contends the state's evidence is insufficient to support the jury's verdict, and, in any event, the verdict is against the manifest weight of the evidence. The legal concepts of sufficiency of the evidence and weight of the evidence involve different determinations. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Thompkins (1997),78 Ohio St.3d 380, 386. Sufficiency is a test of adequacy. Id. We construe the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387.
 {¶ 15} When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict to permit reasonable minds to find guilt beyond a reasonable doubt.Conley, supra; Thompkins, at 387 (noting that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's *Page 7 
resolution of the conflicting testimony"). Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The jury thus may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part or none of a witness's testimony." State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing State v. Antill (1964), 176 Ohio St. 61, 67.
 {¶ 16} The state's evidence is sufficient, when construed in the state's favor, to support the jury's verdict. Tillman testified to the robbery where he recognized the gunman as a regular customer and ultimately identified him in a photo array. The gunman, accompanied by an individual Tillman could not identify, robbed the McDonald's at gunpoint, collecting $500 to $800 from the two registers and single safe. As the robbers were about to exit, the gunman, later identified as Santell Hughes, said "Come on, Branden, let's go." (Tr. 106.) Less than a week later, defendant was apprehended with Santell Hughes in the general area of the robbery. In defendant's back pocket was a mask identified as virtually indistinguishable from the one the robbers wore during the McDonald's robbery; in the back of the vehicle in which defendant was riding with Hughes was the shotgun Tillman and Varney identified as being used in the robbery. Although none of the state's evidence directly identified defendant as the second robber, defendant's subsequent association with Hughes that involved the same mask and gun, coupled with Hughes' statement at the time of the robbery, is sufficient to support the jury's verdict. Defendant's contentions to the contrary are unpersuasive.
 {¶ 17} Defendant contends that even if the evidence is sufficient, the verdict is against the manifest weight of the evidence in light of the alibi testimony of defendant's *Page 8 
grandparents that defendant was with them continually from the time of his release until they dropped him off at his sister's residence at approximately 2:50 p.m., after the time of the robbery. The state, however, was able to point out inconsistencies in the defense witnesses' testimony and thus present grounds on which the jury could reject defendant's evidence.
 {¶ 18} Specifically, although defendant testified that he was released at 9:45 a.m. on February 12, 2005, the parties ultimately stipulated that defendant was released from jail between 8:30 and 8:35 a.m., suggesting the schedule of defendant's day following his release was off by over an hour. With that discrepancy, defendant would have been dropped off at his sister's residence prior to, not following, the robbery. Moreover, although defendant relied heavily on the testimony of his grandparents, their testimony was inconsistent insofar as they testified they saw defendant two days after he was released from jail, but told a detective from the Columbus Police Department they did not see defendant for a week after his release.
 {¶ 19} Indeed, defendant's own testimony about the February 18 incident with Santell Hughes was impeached. Defendant testified he used what he believed to be a "rag" that Hughes gave him, and the police found on him, to clean the mud off his shoes. Defendant, however, admitted no mud was visible on the "rag," or mask, he said he used. (Tr. 318.) Similarly, although defendant testified the rag had his DNA because he spit on it to "spit-shine" his shoes (id.), the prosecution noted the DNA was retrieved from the area cut out for eyes, prompting prosecutorial inquiry about how defendant could fail to see the holes in the mask and so recognize the rag as a mask when he spit on the holes. Defendant attempted to explain by stating he did not see the holes in the rag because the *Page 9 
rag was folded. The prosecution's questions, however, pointed out that, if that be true, defendant's DNA was discovered on parts of the rag otherwise hidden not only from view but also from defendant's "spit."
 {¶ 20} The jury was charged with the duty to weigh the evidence and determine its credibility. Given the discrepancies, or inconsistencies, in the defense testimony, the jury, in weighing the evidence, could deem the state's witnesses to be more credible. This record presents no basis for us to conclude the jury lost its way in so determining.
 {¶ 21} Accordingly, defendant's single assignment of error is overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
 PETREE and KLATT, JJ., concur. *Page 1